No. 101,548

STATE OF KANSAS, *Appellee*, v. MORGAN D. WADE, *Appellant*.

(287 P.3d 237)

filed October 26, 2012.

*Matthew J. Edge*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Morgan D. Wade's convictions for first-degree felony murder and aggravated burglary were reversed by this court, and the case was remanded for a new trial. *State v. Wade*, 284 Kan. 527, 161 P.3d 704 (2007). Upon retrial, the jury convicted Wade of premeditated first-degree murder and aggravated burglary. In this direct appeal, Wade argues that the district court erred in the following ways: (1) By failing to adequately answer the jury's question about the definition of premeditation; (2) by denying Wade's request for a lesser included offense jury instruction on voluntary manslaughter; (3) by imposing an enhanced sentence based upon prior convictions that were not included in the complaint or proved to the jury beyond a reasonable doubt; and (4) by assessing attorney fees against Wade without adequately assessing his ability to pay or the burden such a payment would impose. We affirm Wade's convictions and sentences but vacate the Board of Indigents' Defense Services (BIDS) attorney fees reimbursement order and remand with directions.

## FACTUAL AND PROCEDURAL OVERVIEW

There is no dispute that, on June 19, 2004, Wade shot and killed Kellye Juul, his former girlfriend and the mother of his son. The only dispute involves Wade's state of mind and intent at the time of the shooting.

The couple had a tumultuous on-again/off-again relationship spanning the course of several years. On June 17, Juul rejected Wade's advances and he did not take the rejection well. Later that night and into the next morning, June 18, the former couple spoke by telephone. Juul explained that she was seeing a therapist and wanted to "get her act together" before getting back into a rela-

tionship with Wade. Juul subsequently reported that during the conversation, Wade informed her that he wanted to come get their son and take the child back to Wade's home so that Wade could kill himself in front of their son. Juul responded by telling Wade that he would have to "get some help before he could see [their son] again." Juul reported that Wade responded by saying "she'd be sorry . . . [or] something like that."

The following morning—the day of the shooting—Juul had another telephone conversation with Wade in which she reiterated that Wade would not be allowed to see his son. Thereafter, Wade, armed with his .357 caliber handgun, drove to the house of Dale Coffman, where Juul and Wade's son were living. The length of time between the telephone call and Wade's departure was not definitively established, but a law enforcement officer testified that, using the fastest route, the trip from Wade's house to the Coffman house could have taken as little as 11 minutes and 43 seconds.

Wade reported that as he drove toward the residence he could see Juul outside the house but that she retreated back inside upon seeing his arrival. Undeterred, Wade continued up the driveway, exited his truck, and approached the house. He entered the house through a bedroom window and proceeded through the bedroom to a hallway in the front room, where he approached Juul, who was standing by the front door. Without saying anything, Wade shot Juul in the chest from a distance of 1 to 3 feet. The shooting was witnessed by several children in the house, as well as by the homeowner, Coffman.

After shooting Juul, Wade gave the handgun to one of Juul's nephews and asked for a towel, which he used to apply pressure to the wound. Wade told Juul not to worry, that she had just been shot in the lung and that it was " 'no big deal.' " Meanwhile, the homeowner called 911, and when the police took Wade into custody, he admitted to shooting Juul. Emergency medical technicians transported Juul to the local hospital, which then transported Juul to a nearby airfield to be airlifted to a Wichita hospital. But Juul's liver had been punctured, and she died at the airfield.

At the first trial, the jury convicted Wade of felony murder and aggravated burglary. Those convictions were reversed, and the case was remanded for a new trial. *Wade*, 284 Kan. at 546.

At retrial, Wade argued for an instruction on the lesser included offense of voluntary manslaughter because "there was a sudden quarrel . . . with . . . Juul . . . that enraged him and . . . [he] was in a rage when he got there." The district court denied that request based on the facts of the case.

While deliberating, the jury submitted the following question to the judge regarding the definition of premeditated first-degree murder: "If the act of violence that resulted in the death of the victim was pre-meditated but the defendant wasn't clear on whether the act of violence would result in death, does this constitute pre-meditated murder?" The district court solicited counsels' suggestions for a response. Defense counsel argued for a simple "no" answer, but when the court rejected that idea, the defense proposed that the court answer with the first sentence of Instruction 19, which defined premeditation. The court agreed to refer the jury to Instruction 19 but declined to single out anything less than the full text of that instruction.

The jury convicted Wade of premeditated first-degree murder and aggravated burglary. He filed a motion for a new trial claiming, in part, that the district court gave an improper response to the jury's question regarding the definition of premeditation which created further confusion. At the hearing on the motion, the defense called the jury foreman to testify about his personal understanding of the definition of premeditation after receiving the court's response. The juror's testimony implied that after the judge's answer was given, he understood that, in finding premeditation, "it didn't matter" whether the defendant knew that the act of violence would result in death. The State objected to the testimony as invading the province of the jury, but the district court overruled that objection. Ultimately, the motion for a new trial was denied.

The court sentenced Wade to a hard 25 life sentence for the murder conviction and a consecutive sentence of 55 months for the aggravated burglary conviction. The court also ordered that Wade reimburse BIDS attorney fees of approximately $6,400 based on the BIDS fee table. Wade timely appealed.

RESPONSE TO JURY QUESTION

Wade argues that the district court erred by failing to adequately answer the jury's question about the definition of premeditation. The court has an obligation to respond to a jury's request to be informed on a point of law, pursuant to K.S.A. 22-3420(3), which provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

*Standard of Review*

We review a district court's answer to a jury question for an abuse of discretion. *State v. Moore*, 274 Kan. 639, 643, 55 P.3d 903 (2002).

The State acknowledges that an abuse of discretion review is generally appropriate. But then the State points to *State v. Hoge*, 276 Kan. 801, 816-17, 80 P.3d 52 (2003), to support its argument that Wade's objection to the court's answer at trial is different from his complaint on appeal, so that the clearly erroneous standard applicable to unpreserved jury instruction claims should be applied. Even if we were to agree with the State's premise that Wade presents a jury instruction issue here, we recently clarified that "clearly erroneous" is not a standard of review at all. See *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012). Accordingly, we will apply an abuse of discretion standard.

However, we recently expanded, or perhaps clarified, the scope of an abuse of discretion review. In *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012), we recited:

"Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based."

Obviously, to the extent that it is necessary to determine whether the district court's response was a correct statement of the law, we are presented with a legal question, subject to unlimited review. But when looking at which legally appropriate response the court should have made, we accord the trial court the deference of looking to whether no reasonable person would have given the response adopted by the trial court.

*Analysis*

The trial transcript contains the following discussion between the judge and counsel regarding the response to the jury question:

"The Court: . . . . The question: With regards to Instruction 12, the act of violence that resulted in the death of the victim was premeditated but the Defendant wasn't clear on whether the act of violence would result in death, does this constitute premeditated murder?

. . . .

"[Defense]: . . . I think the answer to that is no.

. . . .

"The Court: Yeah, on this particular question I hesitate to give them a 'yes' or a 'no' answer. Instruction No. 19—

"[Defense]: Yeah, the first paragraph covers that because it—you know, the intent to kill must be formed before the shot is fired.

"The Court: The first paragraph of Instruction 19?

"[Defense]: Well, yeah.

. . . .

"[Defense]: . . . the least you could do is tell them to look over the Instruction No. 19, but I think 'no' is the proper answer because, you know, that's the law. I think intent must be there before the shot is fired or you don't have premeditated murder.

. . . .

"The Court: . . . What I propose to tell the jury is that . . . the answer to your question is contained in the instructions given. Definitions are contained in Instruction 19.

. . . .

"[Defense]: I would request the first sentence of—

"The Court: No, I'm not going to single out any one—I'm not going to single out a specific instruction—you know, specific language within an instruction. I don't think that's appropriate for either side.

"[Defense]: I would just ask you to show my objection on the record.

. . . .

"The Court: The only thing you object to on what I propose to tell the jury is you want me to single out the first full paragraph in 19?

"[Defense]: Right.

. . . .

"[Defense]: Well, first sentence in 19.

"The Court: Well, I'm not going to.

"[Defense]: Okay.

"The Court: I mean, obviously the question is about premeditation and . . . the other paragraph is the definition instruction of reckless and intentional. Obviously it is the first paragraph. I'm not going to tell them the obvious. They ought to be able to read it and see.

"[Defense]: Okay."

The Instruction 19 to which defense counsel and the court refer set forth definitions, as follows:

"As used in these instructions:

"Premeditation means to have thought over the matter beforehand, in other words, to have formed the design or intent to kill before the act. Although there is no specific time period required for premeditation, the concept of premeditation requires more than the instantaneous, intentional act of taking another's life.

"Intentionally means conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing,' 'willful,' 'purposeful' and 'on purpose.'

"Reckless conduct means conduct done under circumstances that show a realization of the imminence of danger to the person of another and a conscious and unjustifiable disregard of that danger. The terms 'gross negligence' and 'wantonness' are included within 'reckless.' "

The trial court apparently determined that only the first paragraph of Instruction 19 was germane to the jury's question but that the jurors would obviously understand that the remaining portions of the instruction simply did not apply. One might ponder how obvious it would be to a lay juror that the judge would answer the jury's legal question with definitions that had absolutely nothing to do with the question. The possibility certainly exists that the superfluous and inapplicable parts of the answer could provide sufficient misdirection to leave some jurors scratching their heads. That would be especially so, if the jurors were unaware of the common prophylaxis of using entire PIK instructions as answers to jury questions to avoid reversal on appeal.

Nevertheless, in reviewing the district court's response to a jury question, we have focused on the question of whether the answer was a correct statement of the law. *State v. Murdock*, 286 Kan. 661, 683, 187 P.3d 1267 (2008). Wade does not argue that the district

court misstated the law. Rather, he argues that the better answer was a simple, "no." That answer might have been the most helpful to the jury. But we have approved the tack of simply directing the jury's attention back to the instructions. See, *e.g.*, *Moore*, 274 Kan. at 645. In that vein, we cannot declare that the district court's answer to the jury question in this case was arbitrary, fanciful, or unreasonable.

## LESSER INCLUDED OFFENSE INSTRUCTION

Wade requested a lesser included offense instruction on voluntary manslaughter, arguing the existence of a sudden quarrel and heat of passion, provoked by the telephone call in which the victim said that Wade could not see his son. The State responded that heat of passion involves "a spontaneously provoked intense emotional state," and there was no spontaneity here because Wade had been angry since being forcibly removed from Juul's residence 2 days prior to the shooting. The district court ruled that the facts did not support a voluntary manslaughter instruction "either on sudden quarrel or heat of passion." Wade continues to argue on appeal that he was provoked into a sudden quarrel, resulting in a heat of passion killing, which would have supported the lesser included offense instruction.

### Standard of Review

Recently, we attempted to set forth a more consistent procedure for reviewing jury instruction issues, with applicable standards of review:

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Plummer*, 295 Kan. 156, Syl. ¶ 1, 283 P.3d 202 (2012).

*Analysis*

To fully preserve a claim that the district court erred in failing to give a lesser included offense instruction, the defendant must distinctly state an objection to the omission before the jury retires to consider its verdict. K.S.A. 22-3414(3). Here, Wade proposed a lesser included offense instruction on voluntary manslaughter and unequivocally objected to its omission during the instructions conference, arguing to the court the grounds upon which he believed the instruction was proper. The issue is fully preserved for our review.

Next, the requested instruction was legally appropriate. "We have held on numerous occasions that voluntary manslaughter is a lesser included offense of both first- and second-degree murder as a 'lesser degree' of those crimes under K.S.A. 21-3107(2)(a)." *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 (2008).

Even when an instruction is legally appropriate, however, the lesser included offense instruction is only required when " 'there is some evidence which would reasonably justify a conviction of [the lesser included offense.]' " *Plummer*, 295 Kan. at 161. The evidence is viewed in the light most favorable to the defendant. 295 Kan. at 162. But we give deference to the factual findings made by the district court, in that we do not reweigh the evidence or pass on the credibility of witnesses. 295 Kan. at 162.

Under the theory propounded by Wade, voluntary manslaughter required "the intentional killing of a human being committed: (a) Upon a sudden quarrel or in the heat of passion . . . ." K.S.A. 21-3403. The language of that statute suggests that "a sudden quarrel" and "in the heat of passion" are two separate concepts, and the district court appeared to treat them as different ways in which to commit the crime. But this court has previously held that a sudden quarrel is not separate and apart from heat of passion, but rather it is simply " 'one form of provocation for "heat of passion." ' " *State v. Johnson*, 290 Kan. 1038, 1047, 236 P.3d 517 (2010) (quoting *State v. Coop*, 223 Kan. 302, 307, 573 P.2d 1017 [1978]). Nevertheless, the evidence in this trial, even when viewed in a light most favorable to Wade, would not have reasonably justified a jury to

find either that Wade and Juul engaged in a sudden quarrel or that Wade intentionally killed Juul in the heat of passion.

*Johnson* suggested that a sudden quarrel involves an *"unforeseen angry altercation, dispute, taunt, or accusation."* (Emphasis added.) 290 Kan. at 1048. In addition to the foreseeability component of the adjective, "sudden" also carries a temporal connotation, indicating that the quarrel occurred abruptly or was brought about in a short time. See Webster's II New College Dictionary 1101 (1999).

Here, the confrontation between Wade and Juul at the time of the shooting would not qualify as a quarrel, much less a sudden one. Immediately before Wade shot Juul, there was no anger displayed; there were no taunting or accusatory words exchanged; and there was no altercation or dispute. Moreover, Wade orchestrated the encounter which is the antithesis of an unforeseen event. He drove to Juul's residence armed with a handgun and climbed through a window to get face-to-face with the victim he had seen retreat into her house upon his arrival. Wade foresaw what he wanted to do and methodically went about effecting his plan. There was simply no evidence from which a rational jury could find that the incident in Juul's residence was a "sudden quarrel."

Likewise, even if a provocation could be found somewhere other than from a sudden quarrel, a jury could not have reasonably found that Wade intentionally killed Juul in a heat of passion. We have defined "heat of passion" as meaning " 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action.' " *State v. Vasquez*, 287 Kan. 40, 54, 194 P.3d 563 (2008) (quoting *State v. Guebara*, 236 Kan. 791, 796-97, 696 P.2d 381 [1985]). The hallmark of heat of passion is taking action upon impulse without reflection.

Wade urges us to consider that the telephone conversation on the morning of the shooting, in which Juul reiterated that Wade would not be permitted to see his son, could have caused such an intense anger that it prompted him to intentionally shoot Juul; notwithstanding the time lag between the provocation and the action. We decline the invitation to speculate about hypothetical scenarios. We do not permit juries to ruminate upon what might have hap-

pened; we require the State to prove the elements of a crime beyond a reasonable doubt. Accordingly, for a lesser included offense to be factually appropriate, there must be actual evidence in the record, together with reasonable inferences to be drawn from that actual evidence, that would reasonably support a conviction for the lesser crime. Here, such evidence does not exist.

First, and foremost, Wade's appearance and demeanor during the shooting incident belie the notion that he was suffering under any intense or vehement emotional excitement. Eyewitnesses described Wade as being "like a zombie." Wade did not refute that impression, and it comports with the fact that Wade's anger had apparently begun to build 2 days before the shooting. Although Juul's denial of access to their son may well have provided a *motive* for Wade to shoot her, it did not provide sufficient provocation for that shooting to be in the heat of passion in this case. A slow burn is not heat of passion.

Next, his behavior leading up to the shooting could not reasonably support a finding that the shooting was an act performed without reflection. To the contrary, the evidence, even when viewed in the light most favorable to Wade, could only prove a calculated act. See *Vasquez*, 287 Kan. at 56 ("Premeditation and heat of passion are mutually exclusive concepts."). He armed himself with the handgun before leaving home, implying that he planned to use it in some manner during the encounter with Juul. He had time to contemplate his actions while he drove to Juul's residence. Then, upon arriving at Juul's residence and seeing her go into the house, he had to devise a plan to gain entry into the house in order to confront his retreating prey.

Finally, Wade's own theory of defense refutes the elements of voluntary manslaughter requiring an intentional killing in the heat of passion. Wade contended that he never intended to kill Juul, but rather he only wanted to scare her so she would come back to him. Granted, "inconsistent theories of defense are permissible." *State v. Trussell*, 289 Kan. 499, 505, 213 P.3d 1052 (2009). But Wade's theory of defense actually corroborates the evidence in the case which supports that the shooting was part of a plan of action, rather than an action without reflection.

In denying Wade's motion for new trial based upon a denial of the voluntary manslaughter lesser included offense instruction, the trial court found: "[T]he facts were absolutely and overwhelmingly clear that what happened that day was not a sudden quarrel, was not in the heat of passion, was not an act on impulse without reflection." We agree. The district court did not err in refusing to give the instruction.

## USE OF CRIMINAL HISTORY AT SENTENCING

Wade argues that the district court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution by imposing an enhanced sentence, based on prior convictions, without proving those convictions to the jury beyond a reasonable doubt. This issue has already been decided adversely to Wade's position. See *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002) (concluding that trial court's use of prior convictions to enhance guidelines sentencing was constitutionally acceptable even though convictions were not proven beyond a reasonable doubt). Wade provides no new arguments that would warrant our revisiting that well-settled rule of law.

## BIDS ATTORNEY FEES

K.S.A. 22-4513 requires that before a district court may require a defendant to reimburse BIDS for attorney fees, the court must consider on the record at the time of assessment the extent of the defendant's financial resources and the burden upon the defendant that will result from such a payment order. See *State v. Richardson*, 290 Kan. 176, 186, 224 P.3d 553 (2010); *State v. Robinson*, 281 Kan. 538, 543, 546, 132 P.3d 934 (2006). This requirement includes an explicit record of how those considerations are weighed in the court's decision. *Robinson*, 281 Kan. at 546.

Both Wade and the State agree that the district court failed to satisfy the *Robinson* requirements in this case. Although the court ascertained that Wade is employable and does work when he is not in prison, it did not ascertain his financial resources or the burden such reimbursement would cause him. Consistent with our prior cases, we vacate the order to reimburse BIDS for attorney fees and

remand to the district court for reconsideration. The district court is directed to support any subsequent reimbursement order with explicit findings on the record, pursuant to our decision in *Robinson*, 281 Kan. at 543-46.

Convictions and sentences affirmed. Attorney fees reimbursement order vacated and remanded with directions.